It's a pleasure to be here. There are two issues before the court. I want to spend the majority of my time on the Miranda issue. The second issue, I'm going to take my cue from the court, and that has to do with the issue we raised about the Eighth Amendment claim and proportionality. As the court is probably aware, we filed a motion to have – We don't get to that unless we get ruled the right way for you on the Miranda warrant. Yes, sir. Or against you on the Miranda warrant. That's correct. And so I'll save my brief comments for that at the end if the court is even inclined to hear it. I recognize the – it's awkward. That's fine. You – that makes sense to me. You're in control of your argument. All right. All right. Ben, getting to Miranda, I think the issue is very straightforward and the law is well settled. There's no issue that this young man was being interrogated, one prong of Miranda. There's no issue that he did not get his Miranda warnings, the second prong. The sole issue is, by objective – I don't mean to cut you off, but there's something that concerned me, just as a preliminary matter. It was a guilty plea to receipt and possession here. Yes, sir. Which carried a five-year mandatory minimum sentence. The receipt did. That's correct. That's right. Okay. And the prosecution here charged production and distribution. And we had a bench trial on that. That's correct. And that resulted in a 15-year mandatory minimum. And this is sort of reading between the lines of what Judge Brinkema said. In your opinion, was this case overcharged? Not – I'm not talking about proportionality, but I'm talking about a prosecution doesn't need to charge everything that they might conceivably prove. Were you kind of surprised to see the production and distribution counts? Well, I'm sorry to say that based on my long experience in this jurisdiction, it didn't really surprise me at all. And I'm sure the court's aware there's been great – They didn't need to charge it? They didn't need to charge it at all. And we pledged to those – You would have had a five-year – Exposing him to 30 years, I believe, under the guidelines, actually. And Judge Brinkema – But you would have had a five-year mandatory minimum under the receipt and possession charge. Under the receipt. And Judge Brinkema says, I don't like this sentence that I'm giving out at all. I think it's wrong. Judge Brinkema's not bashful at all. It's expressing her view that the government in situations like this is usurping the power of the judiciary. She made that very clear. But is it these sorts of cases where it's clear you have a younger, rather younger individual and they go for production and distribution under this? And the thing that's – I don't want to be dramatic, but I would use the word shocking, is that the conduct, in my view, was at the margins of what the criminality is under the – It's not admirable. No, by no means. It's bad conduct. The question I had is whether this needed to be charged. A prosecutor has discretion for a reason. That's right. And you don't just charge everything up to the hilt. The court's going to start me on a rant, but you're also aware of what's – Were you in this case all along? I'm sorry, sir? Were you in this case all the way through? Yes, sir. Okay. You've had it since the beginning? Yes. Okay. Why wouldn't this plea down if they were going to charge to production and distribution? Why wouldn't the case plea down to a five-year mandatory minimum on receipt and possession and just dispense with the bench trial? Wouldn't it – if it was going to be charged this way, wouldn't it plea down? Well, we pled – call it a naked plea. No plea agreement on the five – There's no plea agreement memorialized? That's right. Did you hold out for a charge concession on the production and distribution? My partner was lead counsel. He's sitting here today. And that question would probably be best addressed to Ms. Cain, who handled the prosecution start to finish as well. But the government was insistent on going forward. You made a naked plea because you couldn't make a deal. That's what – usually that's how it comes about. That's right. You couldn't get a deal that gets you anything better. Well, that's right. So you just pled straight up, right? It was our hope that Judge Brinkema would show her distaste for what the government was doing. She had some sympathy for you. She did indeed. But the prosecutors have the vast discretion. They do. And we all know what the Attorney General is trying to do these days, at least in the realm of drug offenses, but doesn't cross over into child pornography. How old was this kid when these offenses occurred? He was 18 and 19. He turned 20 on the day before his trial. He turned 21 yesterday or today. That was a risky move to end a plea of guilt. And I take it that at the actual trial, that became evidence that he had entered a plea of guilt? Indeed. It was the same judge who took the plea who handed the trial. I don't know what you got out of that. Going to trial? I don't know what you got out of pleading guilty. Well, the hope was – Other than to be able to go in and admit something and take away part of the case from the government. Reality comes to bear when lawyers make decisions. And the receipt and possession charge was very difficult to defend. And the hope was that the government would, despite – But they had to prove it. They had to prove it. And to be able to prove it, you've got to start from square one. That's right. I see Judge Wilkinson is all right in terms of how these things are done. I was a military judge for a long time. I saw a lot of these cases. And I never saw one get a sentence on this level. Typically, it happens you've got someone out on the ship, a young person. He doesn't want to go for boarding out into town. So he's out playing with his little computer. And he gets these kinds of things and then it arises in the set of a computer. And then, oh, he has charges of possession, receipt, distribution, hundreds of years he's facing. And Judge Wilkinson is right. Typically, that's not something you would exact the amount of penalties that you could get, mandatory sentences, here. But given the posture of where you are, to rely on a judge to overcome the prosecutor's discretion, I'm trying to understand the value of that strategy. Because you said you're about to go on a rant, but that won't help you if you don't tie this into a legal argument. I understand. So I guess you would try to go there with the Eighth Amendment or you would try to do some type of proportionality review. And you recognize something. That is not easy. In fact, that is already non-existent in cases like this. Even with the juvenile type cases coming up, we're having difficulty. This guy is not a juvenile. So I think that the bottom line is, what are we going to do with this if we empathize or sympathize? What's going to happen? Nothing. I mean, what can we do? The Court's got a remedy, and I realize that I think... We have a remedy. What's the remedy? Well... And what are you aiming at for the remedy? Well, there's two things. The Miranda issue? That would be a partial remedy. Assume you lose on the Miranda issue. Assume you lose on the Miranda issue. Then what's the remedy? The remedy is for the Court to engage in a proportionality analysis and say that in this case... Why can't we engage in a proportionality analysis? I hope you'll decide that you can. Do you think our precedent is against you? I do. You do think it's against you? And you're basing that on the most recent cases, or what? What are you basing that position on? Judge, there's been a stream of cases from the Fourth Circuit. Well, there's been a stream of cases. And I had one of my law clerks go back and study them. And the language of them has changed. It has. It's changed, and it's gotten more pro-government. That's correct. There's at least three of a series of them. And if you go back to the beginning, our precedent is exactly the same as everybody else's. Well, that's right. It morphed over the years. What controls the most recent one or the earliest one? Well... Do you know? I don't. Well, I'll tell you. The earliest one does. If there's an in-bank case in this Court, McMillan, are you familiar with that? I am not. McMillan v. United States, 2004, written by our now Chief Judge, Judge Traxler. Where there is an irreconcilable conflict between opinions issued by three judge panels of this Court, the first case to decide the issue is the one that must be followed unless and until it is overruled by this Court, sitting in-bank, or by the Supreme Court. Now, that's in-bank. Now, if that's the law, then what is the law of the Fourth Circuit on proportionality review in this situation? Well, the law would then be, as expressed by Justice Kennedy in the Harmelin opinion, there's a three-step analysis, and that's what we engaged in in our brief, which we stand by. The first . . . Was it Judge Braycom to apply that? No. She said she couldn't. She said she felt bound. She said she couldn't do it. You know, the difficulty here is that even where the circuits, or even where courts, admit some kind of proportionality review, it would be a very, very difficult thing to apply in this situation. Courts have rejected proportionality review in far more sympathetic situations than here. I mean, I have some sympathy for the question raised about the way in which this was charged and why it wasn't played down, and a whole lot else, but you do have somebody who is soliciting 13-year-old girls and wanting them . . . or 13-year-old boys, I guess, and wanting them to take pictures of themselves and is inducing those sorts of pictures by trading a picture of . . . promising to trade a picture of a Tracy who's nude, and then once he gets the pictures, he distributes them far . . . Not widely, but he did. He distributes them. He did. These are 13-year-old boys, and you can imagine how mortified they or their families might feel when they've learned, and also with social media these days, the ability to humiliate a young child is enormously magnified. So, I have a . . . Do I have sympathy for your plight? Yes, up to a point. My sympathy extends to not getting a 15-year sentence, but a 5-year sentence. You did something that Congress has repeatedly said was quite wrong, and I don't know. It was just a threshold concern I had about the way in which the case was . . . Charged. . . . was charged, but proportionality review, the problem I have with it is I don't understand what the limiting principle is. Yes. May I . . . Let me dovetail what Judge Wilkins said in terms of the 13-year-olds who are now . . . Pornography, child pornography, in many instances, it may be from somewhere overseas, and the actual so-called victims may be . . . This may have been 40 years ago, and that's still child pornography. So, even though it's victim-tied in terms of what it does,  and yet this one makes it . . . When you're looking at proportionality review, you've got to consider these kids are still here. Yes. And still kids. May I . . . I have a number of . . . I do, and I don't know where our time was, but . . . I'm going to give you a little bit of extra time, because we've taken up your time with something you may not have wanted to talk to us about. Well, I did, but I have just a very few things to say about it. I'm going to just say them, and I'll move on to Miranda. You feel pretty good about it, probably, so far. I know I would have felt good sitting on this side of the courtroom in the last case. It is true, and the courts have said over and over again, that it's exceedingly rare that a court's going to find a sentence unconstitutional as being cruel and unusual because of proportionality. I don't question that at all. But there are unique facts about this case, and we tried to point them out. Judge Brinkman made it very clear that this, although chronologically, 19-year-old boy, he was socially immature. She said that a number of times in different contexts. I think that has to play into the calculus in some way. I said before that the conduct was on the margins of the criminality. It was a crime, and it was bad, and as you say, it's conceivable that it'll live on forever. We've seen that. I can tell you that the United States Attorney's Office could prosecute child pornography cases day in and day out without putting a dent in it. It is so rampant. The people who are getting prosecuted and getting those major sentences, which they should, are not these 19-year-old kids. And we presented some statistics from the Sentencing Commission. The average age of someone sentenced for production of child pornography is 42 years old. This is on the far extreme. And you've got a young guy who is going to go off to prison for 15 years. And as I said, perhaps a little too dramatically in my brief, he's ending up with a sentence that Congress never anticipated he would get because he's going to be locked away in a largely secret society where God knows what's going to happen to him. And when he gets out, he's going to be quite a different person and not in ways that we hope that rehabilitation will work. The court in Roper and Graham and Miller, the Eighth Amendment cases dealing with juveniles, make the number of points. But one is that a sentence like that for a young person is vastly worse than a similar sentence for a 42-year-old man. If we were to rule, if we just argue into it, if we were to find some merit in the custody argument, what happens on remand? Well, it's a new ballgame, is all I can say. There will be an effect on the case. I don't know what will happen. Perhaps the United States will take to heart what you've said here and maybe change its view about what they ought to do. I would hope so. Would that be a more straightforward way than trying to engage in a proportionality analysis? Well, if the United States exercised that discretion, that would solve everybody's problem. Let me talk about... To give you some leverage, that's all to do. In your position as a defense lawyer, I want to give you a little bit of leverage. Yes. Let me talk briefly about the Miranda issue, which I think is a real good issue as well. You know, we're talking about custody. That's the only prong of Miranda that's at issue here. Was he in custody? And, of course, the test is, would a reasonable person conclude that his freedom of action was curtailed to a degree associated with formal arrest? Do we review that for clear error? Yes, sir. How'd we get around that standard of review? It was clear error. Here's what happened. And Judge Brinkema said, if it wasn't for that tape recording, you'd win your case, which I take to mean that when she heard all the facts, you know, up to, you know, the interaction between the two agents in that basement room with this 19-year-old kid, that they showed her that he was in custody. Now, we're, and I can reel them off. There were a bunch. What do you do with Judge Brinkema's comments on the tone of the discussion? She said that the discussion was chatty and informal and the defendant was told he's not under arrest and he was told he could leave at any time. He was at home. The door to the interview room was open. There weren't any handcuffs. There weren't any restraints. He said you can go upstairs. You can leave whenever. Given those facts, it was just an informal, chatty thing in which the defendant's free to leave at any time. Is that custodial? Well, there's several things I would say about that. First, what happened in that room downstairs is not in isolation. It's got to be judged by the objective facts and everything that occurred before, which are, in my view, astounding and lengthy and all on our side of the ledger. I can go through them, and I want to briefly, but about what Judge Brinkema said concerning that conversation and the chatty nature of it and that he seemed so relaxed and the police were polite, none of that matters. In our view... Wow, we've been reluctant to find custody in a home environment. Well, it's true, reluctant, but you haven't, and I think the court has said that that is not talismanic, nor is it talismanic that someone's told you're not under arrest and you're free to go. Those are factors that have to be included. But look what happened to him before he even got to that room. And then I do want to address your question about Judge Brinkema's comments. Here's what happened. This house was invaded by 20 to 30 agents. Why the house was invaded by 20 to 30 agents is a question I've got in my mind in a go-in-to-seize-the-computer kind of case in a middle-class neighborhood. So right off the bat, I ask myself, what's going on there? They had a battering ram at the ready, although they didn't use it. They pounded at the door. People inside heard the commotion. The door was answered. The police said they were using a command voice. Then agents streamed through the house with guns drawn, collecting people, all right? Not saying, would you step outside? No. They were taken. The testimony is the mother was taken by the arm, led downstairs. Hashimi is confronted in his bedroom, naked in bed at gunpoint, told to get up, raise his hands, taken by the arm, and told to wait in the front yard with his parents. He's told, stay there. They're out there. We don't have before us a Fourth Amendment claim about the execution of the warrant. No, sir. The question is not a Fourth Amendment one. It's a question of whether those circumstances would give rise to a custodial situation. Exactly so. And that's a fair point. Yes. You're saying everybody was in custody at that point? Everybody was in custody at that point. And that doesn't end. It's really just the beginning. Because at that point, once the house was cleared, and I don't fault the police for doing this. I mean, they're allowed to. But the question is, what would a reasonable person conclude from this and the other factors? They are then directed back into the house. Not told, gee, would you like to come in and sit down and have tea with us and discuss this? No, they're taken into the living room. They're sat down while agents are still streaming. What do you do with the fact that he was told he was free to leave at any time? And he says, no, no, no, no, I don't need to leave. I don't need to take a break. I'm happy to cooperate and talk to you. That all happens downstairs. Once he is led downstairs by the police, who don't say, gee, you know, we'd like to talk to you. Is there a place where we could sit where you'd be comfortable? That's not in the record. What's in the record is he was taken downstairs by an officer in front of him and an officer behind him and put into the room of their choosing. Did his mother want to see him? Sorry, sir? Did his mother want to see him? She did. And what happened there? She was not allowed to see him. So, and by the way, he's in his boxer shorts for a good portion of this. They eventually give him clothes. Why didn't they let his mother see him? I probably have to ask Ms. Candy. She's not even a lawyer and maybe she is. I don't know. We say you have a right to a lawyer, but you don't have a right to your mother? Apparently not. In any event, when he needs to use the bathroom, he is taken to the bathroom. An agent stands with him inside the bathroom. This is all happening. Before he gets to that room. And that's why I think that all this context is important in evaluating what goes on in that room down there. They give him clothes, as I was about to say, but no socks and shoes, which I find interesting. The government says that any incriminatory statements were harmless, Errol. Well, they do. We disagree. Wouldn't it, I mean, when you have the computer evidence of the distribution of the pornographic pictures over Facebook or what have you, do the custodial statements really matter in light of the physical evidence of those 13-year-old boys having pictures of themselves in the nude? I mean, are the custodial statements kind of peripheral? Well, that's an excellent question. And our answer, I think, disposes of it. At the state of the record now, the police got into those computers because the defendant gave them the passwords. So it's poisonous fruit? Yes, sir. When you pled guilty to the possession, did you reserve the right to appeal the issue of custody? What happened at the plea was interesting in that, first, the government did its best to put all the facts in its factual recitation to support the basis for the plea. All the facts of the upcoming manufacturing trial in, recited them for the judge. Counsel, my partner, stood up and said, hey, wait a second, we're having a trial on these next week. You know, this sounds like their opening statement for next week. We're here to plead to these two charges only. Judge Brinkman said, I understand, I understand. And then advised the defendant as well that he was free to appeal the suppression issue. Now, there was no written plea agreement about waiving rights to appeal or anything like that, but that is the advice that he got from Judge Brinkman. But it was not a conditional plea? But it was not a conditional plea. Well, maybe he doesn't have a right to appeal. All I know is what the judge said. She could be wrong. She may be. What if she was wrong? That doesn't give us jurisdiction, just because she's wrong, does it? Or does that undermine the plea? No. Well, I suppose it could undermine the plea. I don't want to even go there. I'm like Judge Wynn. I'm not sure what you got out of this plea. You know, it wasn't a conditional plea, and you didn't get the production and distribution charges dismissed. I just wonder. I will tell you frankly, this was a strategic decision of the defense lawyers. I guess, but I don't understand what you got. What we got is we got the hope that the government would come to a census. Well, you told us from the beginning it wasn't done that way in this particular prosecutorial district. They kind of go after these things. I have abiding faith in the ability of even prosecutors to change, Judge. That didn't work. That business of the trial judge saying to you you still can't appeal the suppression, the issue comes up, arguendo, if we went with format, does that mean the guilty plea is taken care of too? I can see the argument one way or the other in terms of the advice given to the defendant at the time being made. But it's a strange case when we think about the outcome of this case. Maybe the only thing you have a right to appeal is the proportionality review issue. You have a right to appeal the suppression because it came in at trial, in the bench trial. Yes, certainly. Is that why you're appealing it? Yes. So you're appealing it from the trial. That's correct. So that gets you around your conditional plea point. Yes. All right. So you don't need the conditional plea. No, we went to trial and were convicted. I couldn't figure out why you gave up that conditional plea. I'm not sure where I am time-wise, but if I could just have a minute to... I can't see those lights. I can't either. Is your red light on? Mr. Coleman finally turned it off. What? He's so far beyond it, it's turned off. One last thing, and I'll sit down, because you raised the issue of Judge Brinkman's comments. I have great respect for Judge Brinkman. I think she just got it completely wrong. She applied the wrong test. All those sorts of things about, you know, what must have been going through the defendant's mind and how chatty and cooperative he was are addressed to the issue of voluntariness. Totally separate. In this case where we're talking about custody, the test is absolutely objective, not subjective. Not what he thought, but the facts that would impress a reasonable person in his position. And we've got it all in our brief, and I'll just rest on that. All right. Thank you. It was a pleasure. Thank you. We thank you so much, Mr. Shapiro, and Mr. Greenspan's going to have some rebuttal time. Ms. Cain, we need to hear from your side of it. Yes, Your Honor. Good morning. May it please the Court, my name is Maureen Cain, and I represent the United States. This Court should affirm the District Court's order denying the defendant's motion to suppress statements for several reasons. Now, contrary to the defendant's arguments, the District Court made numerous factual findings that do go directly to the custody issue and not just to the voluntariness issue. The District Court specifically stated on the record that- Give a little statement or so about- you spent a lot of time with the other side on this business of proportionality and the question of the manner of proportion in which this plea was given, the question of why it went forth on this is- and I understand that maybe it doesn't go too much to the heart of the issue, but it nonetheless was discussed a lot, and it seems like maybe you ought to say something in response to that. Absolutely. So it is important to note that this defendant is an online sexual predator and a sexual predator in person. We have recorded statements from this defendant that he sexually abused five children he was in direct contact with ages 8 through 15. That didn't satisfy him. He then took his activities online to groom little boys that he found on the Internet after trolling the Internet, and he would engage these young boys into conversation pretending to be this young, attractive female. He spent weeks, months, and even years with minor B, enticing him and persuading them to engage in sexually explicit conduct so that he could obtain child pornography. After obtaining this child pornography, he turned around and he distributed the images of minor A and minor G to others on the Internet. He spent years. At the time of this, he was how old? So he was charged for conduct from when he was 18 and 19 years old. His youngest victim was 13 years old, and the trial record shows that the youngest victim told him, I'm kind of embarrassed. I haven't even hit puberty yet. So the years, I'm trying to understand years. He spent years. Are you talking about since he was 18 or years started back before he was 18? So for what he was convicted of, it was 18 to 19 years old, the way we charged the indictment. But you mentioned something about things going on. Correct. I'm trying to see if that's before. Correct, and so then for one of our victims, minor B, he started that contact or conduct when the defendant was 17 years old and continued to talk to minor B for a number of years, and it took years for minor B. Some of this was juvenile conduct. Some of the relevant conduct that came in at trial was juvenile conduct as to minor B and minor B only. Minor A and minor G. Minor B, the juvenile conduct goes back to 17 only or does it go back before that? From what I recall with trial, it only went to 17. He may have been engaged in this even earlier, but I don't recall. I'm talking about your evidence. Oh, correct. For our evidence. Correct. It goes back to 17. Correct, and the defense did not. And so when he pled guilty, that exposed him to 10 years? He pled guilty to two counts? Correct. He pled guilty to possession and receipt of child pornography. Which gave him exposure to? 30 years. Up to 30 years. Then he had up to 30 years. Okay. Correct. So he could have gotten 30 years for that. Correct. And then after that, that wasn't enough for you, though. Correct. And then after that, you wanted to trial, you went to trial to get him convicted on the offense that had the 15-year mandatory minimum. Correct, Your Honor. Because you wouldn't trust the court to give him enough time, even though the court had up to 30 years leeway. You wanted the 15-year mandatory minimum, and you could only get that by going to court. And I respectfully disagree with that statement, Your Honor. Which statement? The Department of Justice that we didn't trust. Correct. Factual recitation? That we didn't trust the district court. The Department of Justice has a policy. Well, if 30 years is a lot of time for a 19-year-old kid, even in the circumstances that you have described, and I don't argue with any of the facts, we accept that. He pled guilty to it. But 30 years is a lot of leeway. I mean, there are a lot of real bad people out there that have gotten less than 30 years in the court system in this country, even in the Eastern District of Virginia. But you went to trial and exercised a prosecutorial discretion to get the 15-year minimum. We went to trial with our prosecutorial discretion. We have a policy that if we indict on counts, we need to go to trial. You all have a lot of policies. The government's got a lot of policies. I stood in your shoes for a long time, and I know all about government policies. But in the bottom line, though, is somebody, somewhere along the line, using some common sense. That's the exercise of prosecutorial discretion. You went to trial here to get the 15-year mandatory minimum. That's what you got out of the trial. Isn't that correct? We got that out of the trial. You got that out of the trial. You didn't have that from the guilty pleas. Correct. What did you have from the guilty pleas? You had how much in terms of mandatory minimum and how much in terms of the statutory maximum? For receipt of child pornography, it's a mandatory minimum of 5 years incarceration and a maximum of 20. And then for possession of child pornography, there is no mandatory minimum, and the maximum is 10 years. So you had a mandatory minimum of 5 on the receipt and possession counts. Just on the receipt. On just receipt. But you had a mandatory minimum of 5 and a statutory maximum of 30. If the district court chose to stack the counts, then yes, 30. But how many counts of receipt and possession? One count of receipt, one count of possession. All right. So if the district court wanted to stack, you had a minimum of 5 and a maximum of 30. Correct. Nick, I did want to, it's not that I disagree with my fine colleague's comment, but I did want to understand what the Department of Justice policy was. So Department of Justice policy states that if you indict a case, you are to go forward on the most readily provable serious, the most readily provable and serious offense. And our production of child pornography was our most readily provable case. All we had to do to prove that case was to introduce all of the email evidence that came from the T.Campbell. But you weren't obligated to do that. I mean, surely you have a Department of Justice policy, but isn't there some discretion on the part of an AUSA to not to charge everything? I mean, these cases vary in their facts. Wouldn't the 19-year-old age of this individual, might that not weigh in his favor? I mean, you're not obligated, are you, to push on? So AUSAs have their discretion, but of course we have our supervisors and we have people above them that shape what we can and cannot do. The policy is a policy, but it's not frozen. It's not lockstep. It doesn't exist to the exclusion of saying, you know, hey, we can prove the production and distribution, but we've already got five years and we might argue for more. And this is a 19-year-old kid. And you'd have discretion there not to push it? Arguably, yes. But I have supervisors and people higher up from me that shape what line prosecutors do. I understand, but you could, you know, you could, they're not, Judge Wynn says some common sense ought to, you know, enter in somewhere. I mean, I think you can sense we are uneasy about this. And the uneasiness is not that this individual is blameless. What this individual did was terrible, but his life's going to be ruined, very substantially impaired with a five-year sentence and whatever else he got. It's very difficult to come back and get a job and make a go of life. And if he's in for 30 years or 15 years, you know, his chances of really doing very well in life are about over. It's just hard to recoup. Now that, in my view, doesn't argue for proportionality review because of what he did and because of our precedents and because courts across the country have rejected proportionality review in cases that are far more sympathetic than this one. Because it's very difficult to have a proportionality framework or to understand what the limiting principles are other than the judges don't like the sentence. So that's not the way to go. But I'm still uneasy. I don't like it, what happened here. So Judge Brinkman didn't like what happened here as far as I can see. So in the event you lose on your custody point, and I'm not saying you will, what's going to happen? So if we were to lose on the custody point, I argue that there is harmless error. I know. Suppose you lose on harmless error. Oh, and that I lose on harmless error. Then the case would have to go back down and the production and distribution charges would remain outstanding and we would have to go back to trial on those cases. Okay. And then we'd have to go back to sentencing. You'd go back to trial on what? The production and distribution counts. You'd have to make a decision as to how you're going to proceed on it. Correct. I mean, my supervisors would dictate how we're going to go forward. So you don't make any decisions. Are you telling us now you don't really make any decisions? No, I do make plenty of decisions. Folks up here are called supervisors. No, I do. And are these supervisors, I want to follow up on that question, are these supervisors in this case, are they in Washington, D.C., or are they in Alexandria? Both. Well, somebody makes the final call. Is that the United States attorney sitting in Alexandria? Yes. He makes the final call. For purposes of this case. For purposes of this case, it was the United States attorney in Alexandria. Yes. All right. All right, and you say we're going back to trial. There's going to be some discussion about that. Well, of course there would be discussion, but that is the posture that we would then be in if this case were to go back down. The posture is that you could go back to trial. Correct. The question, you know, you're not obligated. Correct. You could negotiate a plea. Correct. However. Or try to negotiate a plea. Correct. But based. Ninety-eight, nine percent of the cases you've all prosecuted end up in pleas. Seems like the ones come through here. There are numerous pleas, you're right. Hardly anybody goes to trial anymore unless everybody pleads guilty. You're correct. There are many, many pleas out there. It is important to note that, one, this isn't a kid. This is a man who is able to vote. He's able to join our military. He's able to get married. He displayed tremendous psychological manipulation and sophistication by targeting these kids online. And as I said before, minors A and minor G are now floating around on the Internet with their faces exposed engaging in sexually explicit conduct because they thought that they were talking to a young, attractive girl who was romantically interested in them. And Judge Brinkema, despite the statements that she made about the mandatory minimum at trial, she said the evidence of enticement is overwhelming. And she said that you couldn't come up with a better case of enticement. You go back to the facts. And so, as I said before, we, and Judge Wilkinson emphasized, we don't disagree with you on any of that. We just don't. And we're just wondering how that ended up. It's horrible conduct. It is. It's horrible conduct. The question is, you know, do you get a 15-year mandatory minimum and then something, then whatever. No, it's just, it's, this was not a homicide. He didn't, as far as I could, did he ever come in physical contact with any of these children? Not with the three boys online, but he sexually abused the five, ranging in age from 8 to 15. And that's incredibly problematic. When he was a juvenile. Both, as a juvenile and as an adult. And he admits to this on the tape recording. All five kids, he admits to it. And then in the doctor's report, Dr. Mattson's report that was also submitted, he talks about some of the instances. So all that would come in as relevant conduct? Well, we moved to notice it as relevant conduct, and Judge Brinkema thought it would be too prejudicial, so she said it wouldn't come in. You know, so often things in law come down to a matter of degree. And a matter of balance. And it would, you try to balance your disgust. I use the word advisedly for the solicitation and the prolonged solicitation that occurred here with the question of whether you can sort of place a life beyond redemption. And it's difficult for me because I feel torn about it. And I recognize that under the law, it's not my job to sentence. I don't think it's my job to engage in a freewheeling proportionality review, but I'm really not happy. Tell us about the custody issue and why you think this was not custodial. With respect to the custody issue, the undisputed evidence shows that and the evidence that you have to view in the light most favorable to the government to the extent that any of this was not on the tape shows that the defendant was told multiple times that he was free to go and he is not under arrest. On the tape, you hear the agents repeatedly telling the defendants, you can answer some questions or you don't have to answer questions, it's completely up to you. Do you not consider the circumstances under which that is said? I mean, it's one thing to say that in a nice comfortable setting and maybe you're out in the open and you can leave whenever you want to leave and the person feels that way. But isn't there such thing as the circumstances can feel so overbearing that your words might be meaningless? I mean, you've got 20 officers who stormed into this house, which is incredible in and of itself, but I mean, what time of day was it? So it was at 9 a.m. and the defendant's father... 9 o'clock in the morning. What day of the week? It was a weekday. They were waiting for the young boy, the youngest boy, to go to school, but I don't remember what day. This is a family who's in the house. You have the father who has a federal drug conviction for conspiracy to distribute heroin. They're not coming for his federal drug. Is that the reason they stormed in? No, but they knew about that going into the house. What was in it? Just tell me. Father? Mother? The mother. There was an aunt. There's the defendant. And then there's a younger brother. Don't they have information? They had a lot of guns and bombs or anything in there? Going into the house, they did not have specific information on guns and bombs. However, Hargrove allows for law enforcement to go in, do their protracted sweep, and have guns drawn. I don't think we have a question of... I don't think we have a Fourth Amendment question before us. It's not a question of how the warrant was executed, because you can get into some very difficult situations trying to prescribe for police what they can and can't do in a situation where they might well anticipate danger. That isn't before us. The question is not whether the manner of execution violated the Fourth Amendment, but the question is whether it created a degree of coercion such that an individual would feel themselves in custody. And when you have the family pulled out on the lawn and you have 20 to 30 agents, and you have the family members taken into different rooms, and you have the 19-year-old brought down to the basement for a conversation, and the boy's mother is unable to reach him, and when he goes to the restroom, he is accompanied by an officer. The question then, particularly with somebody 19 years old, is whether you could have taken the rather routine step of reading Miranda warnings. You might have gotten the same statements that you got anyway. But why would that be such an exceptional burden upon law enforcement in situations like this where you've got a SWAT team of 20 to 30 people and you've got the suspect in a situation where he's not with his family? Why would it be an impossible burden on law enforcement to ask them to read Miranda warnings? So, law enforcement did not view him in custody. And, in fact, Detective Craig Paul repeatedly stated during the suppression hearing he was not under arrest, and had the defendant got up and left, Detective Craig Paul would have let him leave. So if he's not in custody, then law enforcement didn't believe, we need to read him Miranda rights up front. And with respect to this protective sweep, you're absolutely correct. They're not challenging Fourth Amendment issues. But Hargrove talks about the custody issue in light of a protective sweep with agents armed storming a house. And Hargrove states that just because that happens during the protective sweep time period, does that then turn the interview automatically into a custodial situation? They recognize... One of the things that's driving this situation is that this defendant is 19 years old. And, you know, to me that's very different from somebody who's 45. Well, you know, the defense makes a number of arguments about him being 19 years old. It's important to note he graduated, he finished his first year of college, he was working part-time at the time of his arrest. The district court specifically found on the record this is an intelligent man. And when you look at his actions, the psychological manipulation to get these boys to do what he wanted to do, it's clear he is an intelligent person who knows what he's doing to get what he wants. And furthermore, you know, Judge Brincombe noted on the record, oh, he's 19 and he's immature. But I think we need to be careful about how we interpret he's immature. I mean, there are 40-year-old men who play video games on these high-tech PlayStations and online. And I could say, well, geez, that's immature. But that doesn't then make them have lessened culpability for the criminal conduct that they engaged in under the Eighth Amendment. Speak to the non-prejudicial effect that you say, even if we did, without those statements, there was enough evidence to prove it. Mr. Greenspan stipulated that the emails between minors A and minor G are from his client, the defendant. And so with that stipulation, there is no question that the defendant was the user of that email account and engaging in the enticement and the persuasion conduct and receiving the images of child pornography and distributing them. He might not be stipulating it the next time around. That's probably correct, Your Honor. But with that, now the defense argues in their reply brief, oh, that doesn't matter. We were planning on appealing this case all along. But the defense has a duty to preserve the record. And they did not preserve the record on that point, allowing the United States to argue harmless error. Moreover, the defense, during the plea hearing, admitted that, yes, I used the T. Campbell 2011 Gmail account to receive these images of child pornography from minors A, B, and G. Again, further tying this defendant as the user behind that account, which made up all of our production and distribution evidence. So it's the emails and the emails alone that make up our case, plus the stipulations as to who was on both ends of those emails. Counsel, we've given everybody a lot of extra time. And we appreciate not only Mr. Shapiro's argument. We very much appreciate your argument. Thank you so much. Thank you. And let us hear now from Mr. Greenspan and Rubato. Good morning. May it please the Court, and we do appreciate the opportunity for the extra time and argument here. And I suspect from the inquiry of the Court to Mr. Shapiro particularly that I may be on the hot seat. So I'm certainly happy to answer any questions the Court has as to how this proceeded. Mr. Hashimi, when he came to us, was charged with a 15-year mandatory minimum, a five-year mandatory minimum. And we, as you might expect, tried to negotiate with the government to get rid of the 15-year mandatory minimum. I assume he could have been charged with much more, couldn't he? There really wasn't much more. They sort of threw the child pornography book at him. For each one of those distributions, is there a separate charge or are they lumped together? There were multiple. It could have been more, but they could all be run. That's my question, is that could they have charged for each one of those distributions? Theoretically, but they could all be run. It was courted theory. Each one is a separate distribution. Theoretically, as to what the government... For which they exist, sentences. That's right. And then that would have been a sentencing issue because those could be run concurrently as far as that mandatory sentence on that is concerned. But here's the situation. If I could address some of the Miranda points and then talk about the plea process. And I know that I'm on a short leash time-wise. You don't have a whole lot of time. Yes, sir. On the Miranda issue, you know the facts about the entry into the house and all of that. The police never told Faisal Hashimi, who is a big kid, but he's sort of a baby Huey-ish. Well, he's great big, heavy, overweight, immature in manner and so on. He was not a great student. He went to a community college, took a couple of courses, and worked at Best Buy. And the police did not tell him that his mother wanted to talk to him. The police were directing this all around, as you've heard. But here's some of the highlights of what went on down there in the basement. He was told that while the agent was going upstairs that he would have to leave someone there to watch him because he couldn't leave him alone. That's the officer's testimony. He was told... Did Judge Brinkman credit that? She heard all of it. That was from the officer? Yes, that's right. He was told, I don't care if you don't want to answer, but I need to know the truth. So that can mean, I don't care if you don't want to answer, you're going to answer my questions. That's essentially a command manner by the police. They wanted Hashimi to stay in the basement. Here's what really happened. The government suggests that maybe he didn't have to stay in the basement. The agent says, the officer says, I will go up, see what's going on, then come back down and talk to you and let you know what's going on. Are you cool with going up and sitting with your parents right now? Hashimi says, I don't want you... Or he says, I don't want you writing this statement in front of your parents unless you want to. I can't leave you here with nobody here. I can grab another agent. The government points to claimed evidence that Hashimi could do as he pleased. That's subject to interpretation, but it has nothing to do with signing a consent form or anything about the emails. He is told he can do what he wants, but that's with regard to the written, the consent to have access to the computers. That's not with regard to whether or not he was in custody at all. And Judge Brinkema credits sort of the tone of all that, but the analysis stops when they start questioning him. It's at the point that they start questioning him, not the two hours of questioning, which we assert drives the custody Miranda issue. As far as the facts of the case are concerned, there's been some liberty taken, we would suggest, by the government as far as that's concerned. There's a suggestion which Ms. Cain brought up over and over again to Judge Brinkema about the statement including suggestions that there had been some hands-on physical contact. Government doesn't tell you that the CPS investigations, Child Protective Services, all came back unfounded as far as that is concerned. There's no prosecution, state or federal, as far as any of that is concerned. So the government tries to paint Faisal as far as that's concerned. The custody, sorry, not the custody, as far as the references to him being a man, not the kid, the court made evaluations in that regard, but the government made statements, sorry, the court made a finding as to what this is, and if I get anything across in this brief time, this is not a solicitation type of a case where somebody's on the computer trying to find kids to meet up with at the McDonald's to take into a car and to do terrible things to. These kids, they were 14, 15, 13, 15, and 15, I believe, at the time of this sexting. Judge Brinkema called it sexting. She said this is sexting. They were hardly coerced in a literal sense to do anything. These kids found Hashimi. Hashimi found these kids on websites that were for this kind of conduct. It's not that he's going out to a high school yearbook and finding names and finding them on Facebook or something of that nature. This is the sending back and forth of pictures with no solicitation to try to meet up at McDonald's later or to get together. There was very little sexual talk. Some of the boys in question were more sexual in their chat than Hashimi was. So that all goes to then the sentencing and the proportionality evaluation of the case because this is not someone who's out there. It's somebody who wanted to get pictures. It's not somebody out there who's trying to solicit for physical sexual abuse. I'm not congratulating Mr. Hashimi, obviously, for this conduct. So we tried to work this case out as a five-year minimum mandatory, and if Judge Brinkema felt that she should give them seven or eight years, then she could do what she felt under those circumstances. The government said, and they can't get around it, the court used the same words, that they were effectively not trusting her to do the right thing. They had up to 30 years at that point. So when you get down to the strategy, if you will, we did not prevail on the suppression motion, and I believe that in light of that, or I think the record's clear. I shouldn't say I believe to the court, but the record is clear from all the statements that were made, and I encourage the court to read all these comments back and forth with the court that the best posture of this case is we were going to lose on the receipt and possession type charges, but that the sexting charge, the production charge, was certainly arguable, but given the statements that were admitted, that it was arguable much more favorably to a judge than to a jury. If the statements aren't admitted, then the sexting case likely goes to trial in front of a jury. So there is no way that it's harmless error because there was consideration as to what was the best way tactically, strategically, to try the case given the circumstances as they existed at that point. And so it's anything but harmless error. The government, Miss Kane told the judge about DOJ policies, told me about DOJ policies, on and on and on again. If the court wants, I will, by Monday, provide a pleading which identifies cases where the U.S. Attorney's Office in the Eastern District of Virginia time and time again pleads down cases despite the policy in case, and that policy is all in question given the recent comments by Attorney General. The policy is a guideline, isn't it? It's not rigid. It is not rigid, and I've had line prosecutors... The Attorney General himself has criticized these mandatory minimums. Yes, sir. And I've had, you know, you go to supervisors or the line prosecutors go to supervisors, and that's a term of negotiation. If I was saying, let them plead to possession, no mandatory minimum, it would be a different story. But the offer was to plead to a five-year mandatory minimum for a 19-year-old, and this conduct went back into Faisal Hashimi's mid-teenage years. The government knew that. The forensics, computer forensics show that. We want to thank you, sir, unless my colleagues have some additional questions. Judge King, do you have one? All right. Thank you. Thank you very much. And what we'd like to do is adjourn court and come down and greet each of you.
judges: J. Harvie Wilkinson III, Robert B. King, James A. Wynn Jr.